## In re WELDING FUME PRODUCTS LIABILITY LITIGATION.

### Case No. 1:03–CV–17000. MDL Docket No. 1535.

United States District Court, N.D. Ohio, Eastern Division.

April 5, 2005.

Andrew S. Goldwasser, Phillip A. Ciano, Ciano & Goldwasser, Christina M. Janice, John R. Climaco, Climaco Lefkowitz Peca Wilcox & Garofoli, Cleveland, OH, D. Grant Kaiser, The Kaiser Firm, D. John Neese, John Eddie Williams, Jr., Williams Bailey Law Firm, LLP, Houston, TX, Daniel E. Becnel, Jr., Reserve, LA, Don Barrett, Richard R. Barrett, Barrett Law Office, Lexington, MS, Drew Ranier, Ranier, Gayle & Elliot, Lake Charles, LA, Frederick C. Baker, Joseph F. Rice, Motley Rice LLC, Mt. Pleasant, SC, Gano D. Lemoine III, Murray Law Firm, New Orleans, LA, James D. Shannon, Kelley M. Berry, Shannon Law Firm, Hazlehurst, MS, John T. Murray, Murray & Murray, Sandusky, OH, Matthew W. Willis, Walter Umphrey, Provost Umphrey Law Firm, Beaumont, TX, Mikal C. Watts, Watts & Heard, L.L.P., Russell T. Abney, Watts Law Firm, Corpus Christi, TX, Richard F. Scruggs, Sidney A. Backstrom, Scruggs Law Firm, Scott O. Nelson, Maples & Lomax, Pascagoula, MS, Roy F. Amedee, Jr., Attorney at Law, Laplace, LA, Robert E. Piper, Jr., Piper & Associates, Shreveport, LA, Ftemkos (Tim) J. Yianne, Bell & Bands, Charleston, WV, for Plaintiff.

David C. Landever, Weisman, Kennedy & Berris, Cleveland, OH, for Plaintiff/Defendants.

Michael W. Ulmer, Watkins & Eager, Gordan Urban Sanford, III, O. Stephen Montagnet, III, McCraney Nosef Montagnet & Sanford, Richard M. Edmonson, Armstrong Allen, Ross F. Bass, Jr., Christopher R. Shaw, William C. Brabec, Wilson H. Carroll, Phelps Dunbar, LLP, Cable Frost, Baker, Donelson, Bearman & Caldwell, Jack McCants, Sheila Bossier, Forman Perry Watkins Krutz & Tardy, M. Faith Risher, Thomas Y. Page, Page, Kruger & Holland, P.A., Jackson, MS, Ralph A. Davies, Davis, McFarland & Carroll, P.C., Pittsburgh, PA, Richard E. Sarver, Barrasso Usdin Kupperman Freeman Sarver, Paul L. Peyronnin, Roy C. Cheatwood, Christopher R. Teske, Phelps Dunbar, LLP, Wiliam B. Gaudet, Adams and Reese, David M. Melancon, James B. Irwin, Irwin Fritchie Urquhart & Moore LLC, Glenn L.M. Swetman, Aultman Tyner Ruffin & Yarborough, Ltd, Daniel W. Dilzell, Peter S. Koeppel, New Orleans, LA, Jessica D. Miller, Stephen J. Harburg, O'Melveny & Myers, George D. Ruttinger, Crowell & Moring, Rebecca A. Womeldorf, Katharine R. Latimer, Bonnie J. Semilof, Spriggs & Hollingsworth, David A. Handzo, Michael B. Desanctis, Jenner & Block, LLC, Sharon M. McGowan, Jenner & Block, LLC, Todd Eskelsen, Sonnenschein, Nath & Rosenthal, Joshua D. Wolson, Covington & Burling, Washington, DC, R.M. Patrick McDowell, R. David Kaufman, Randi C. Mueller, Charles McBride, Brunini Grantham Grower & Hewes, PLLC, Roy Campbell, Adams and Reese, Michael S. Minyard, Baker Donelson Bearman Caldwell Berkowitz, C. York Craig, Jr., Jack R. Dodson III, Craig Hester Luke & Dodson, Silas W. Mccharen, Daniel Coker Horton & Bell, P.A., Richard F. Yarborough, Jr., Smith, Reeves & Yarborough, Jackson, MS, Eric Kennedy, Weisman, Kennedy & Berris, Horatio G. Mihet, Steven S. Kaufman, Thompson Hine, John J. Haggerty, Maria A. Citeroni, Yelena Boxer, Ulmer & Berne, Daniel F. Gourash, Robert D. Anderle, Porter, Wright, Morris & Arthur, John B. Stalzer, Reminger & Reminger, Kevin C. Alexandersen, Gallagher, Sharp, Fulton & Norman, John M. Alten, Ulmer & Berne, Cleveland, OH, Alan W. Brothers, Hubert O. Thompson, Ronald Austin, Jr., Brothers & Thompson, James W. Ozog, Richard J. Leamy, Jr., Wiedner & McAuliffe, Joseph F. Spitzzeri, Johnson & Bell, Anthony L. Abboud, Wildman, Harrold, Allen & Dixon, Christopher J. Murdoch, Holland & Knight, Chicago, IL, Michael R. Sistrunk, McCranie Sistrunk Anzelmo Hardy Maxwell, H. Patrick Rooney, Southern Legal Clinics, Steven Barth Witman, Valerie Theng Matherne, Metairie, LA, Joseph R. Ward, Jr., Ward & Suzanne Wright, McCranie Sistrunk Anzelmo Hardy Maxwell & McDaniel, Dana Anderson–Carson, Gary M. Zwain, Duplass, Zwain, Bourgeois & Morton, Gregg L. Spyridon, Michael W. Rutledge, Spyridon, Koch & Palermo, Metairie, LA, Condrey, Covington, LA, Clark R. Silcoz, Rosslyn, VA, David P. Stoeberl, Sonnenschein Nath & Rosenthal, John S. Sandberg, Mariquita L. Barbieri, Sandberg, Phoenix & Von Gontard, St. Louis, MO, Bradley J. Yeretsky, Brian D. Williams, Daniel Bukovac, Leonard J. Johnson, Stinson Morrison Hecker, Kansas City, MO, Kenneth J. Parsigian, U. Gwyn Williams, Goodwin Procter LLP, Dawn M. Perlman, Jennifer L. Conrad, Testa, Hurwitz & Thibeault, Robert B. Lovett, Boston, MA, Mark A. Kinzie, Stinson Morrison Hecker, Matthew J. Eddy, Moser & Marsalek, P.C., St. Louis, MO, David M. Ott, Bryan Nelson Bruce McKinley, Copeland, Cook, Taylor & Bush, P.A., Ridgeland, MS, William B. McKinley, Copeland Cook Taylor & Bush Ridgeland, MS, Randolph, Raymond D. Carter, Hopkins, Barvie & Hopkins PLLC, Gulfport, MS, Hattiesburg, MS, Jennifer Valley, Columbia, MS, R. Dean Church, Jr., Johanna G. King, Gary A. Lee, Richard M. Perles, Lee, Futrell & Perles, Lee Putrell, Gordon

P. Wilson, Kristopher T. Wilson, Ralph S. Hubbard III, Seth A. Schmeeckle, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, Lawrence E. Abbott, Abbott, Simses & Kuchler, New Orleans, LA, Mark R. Chilson, Young & Alexander, Dayton, OH, Jay M. Jalenak, Jr., Kean Miller Hawthorne D'Armond McCowan & Jarman, John D. Ziober, Kennon, Odom & Dardenne, Baton Rouge, LA, Gerardo H. Gonzalez, Gonzalez, Saggio & Harlan, Milwaukee, WI, Ewing E. Sikes, III, Royston, Rayzor, Vickery & Williams, Brownsville, TX, Charles Read, John H. Beisner, O'Melveny & Myers, Los Angeles, CA, Ross F. Lagarde, Abbott, Simses & Kuchler, Covington, LA, Jeremy R. Sayre, Ward & Smith, Raleigh, NC, Mary Alice Parsons, Ireson & Weisel, Houston, TX, for Defendants.

### MEMORANDUM AND ORDER

O'MALLEY, United States District Judge.

The plaintiffs in this Multi–District Litigation have filed lawsuits against various manufacturers, suppliers, and distributors of welding rod products, as well as related trade associations. The plaintiffs assert that the inhalation of manganese contained in the fumes given off by welding rods during the welding process caused them neurological injury and other harm, and that the defendants knew or should have known that the use of welding rods would cause these damages. The gravamen of the thousands of complaints that have been consolidated in this case is that the defendants "failed to warn" the plaintiffs of the health hazards posed by inhaling welding rod fumes containing manganese and, in fact, conspired to affirmatively conceal these hazards from those engaged in the welding process. Among other theories of liability, the plaintiffs assert claims for strict liability, negligence, fraud, and conspiracy.

Certain defendants [1] have filed a motion to dismiss (docket no. 118), arguing that all of the plaintiffs' post–1985 claims premised on a failure to warn, regardless of how the claims are denominated, must be dismissed as a matter of law under the doctrine of federal pre-emption. Specifically, the defendants argue that the Hazard Communication Standard, 29 C.F.R. § 1910.1200, which was promulgated by the Occupational Safety and Health Administration ("OSHA"), pre-empts all state common law torts based on a failure to warn.[2] For the reasons stated below, this motion is **DENIED**.

### I. The OSH Act and the HazCom Standard.

In 1970, Congress enacted the Occupational Safety and Health Act ("OSH Act"),

---

1. The motion to dismiss addressed in this opinion was filed by defendants Deloro Stellite Company, General Electric Company, National Electrical Manufacturers Association, and Select Arc, Inc. *See* docket no. 118. Two other defendants—Industrial Welding Supplies of Hattiesburg, Inc. d/b/a/ Nordan Smith, and National Standard Company—later joined the motion. *See* docket nos. 129, 142, 579. The many other defendants in this case did not join the motion or, as best the Court can tell, file any other document asserting similar pre-emption arguments.

2. OSHA promulgated the Hazard Communication Standard in 1983, but the regulation did not require chemical manufacturers to comply until November 25, 1985. *See* 29 C.F.R. § 1910.1200(j)(1) (1984), 48 F.R. 53280, 53346 ("Chemical manufacturers and importers shall label containers of hazardous chemicals leaving their workplaces, and provide material safety data sheets with initial shipments by November 25, 1985"). The same compliance date applied to distributors. *Id.* § 1910.1200(j)(2) (1984), 48 F.R. 53280, 53346. Thus, the moving defendants assert the plaintiffs' claims for failure to warn are pre-empted to the extent the alleged failure occurred after November 25, 1985.

29 U.S.C. § 651 *et seq.* The purpose of the OSH Act was "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). Among other mechanisms to achieve this purpose, Congress "authoriz[ed] the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." *Id.* § 651(b)(3). As the Supreme Court has recognized, Congress "thereby brought the Federal Government into a field that traditionally had been occupied by the States." *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 96, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992).[3]

Recognizing that some States had, to varying degrees, already promulgated their own "occupational safety and health standards," Congress also enacted three provisions addressing the federalism implications of the OSH Act. First, Congress allowed the several States to take some or all of the OSH Act mission "in-house," under certain conditions:

> Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title shall submit a State plan for the development of such standards and their enforcement.

*Id.* § 667(b). The Secretary of Labor could then approve or reject the State's plan. *Id.* § 667(c, d). Among other things, approval required that the State's standards, and enforcement thereof, "will

be at least as effective in providing safe and healthful employment and places of employment as the standards promulgated under section 655 of [the OSH Act]." *Id.* § 667(c)(2).

Second, Congress added that "[n]othing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under section 655 of [the OSH Act]." *Id.* § 667(a). For reasons explained below, even though § 667(a) does not use the term "pre-empt," the Court refers to it below as the OSH Act's "pre-emption provision." Read together with the first provision cited above, the general upshot of this clause is that States can set standards in areas where OSHA has not, but cannot set standards in areas where OSHA has, absent OSHA approval—which approval will depend on, among other things, the State's standards being "at least as effective" as the federal promulgations.

Third, Congress also included what has become known as the OSH Act's "saving clause." The "saving clause" states:

> Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

*Id.* § 653(b)(4). The interaction of the OSH Act's pre-emption provision and sav-

---

**3.** Indeed, while Congress authorized the Secretary of Labor to set national health and safety standards, Congress also "encourag[ed] the States to assume the fullest responsibility for the administration and enforcement of their [own] occupational safety and health laws," in part by providing "grants to the States to assist in identifying their needs and responsibilities in [this] area." *Id.* § 651(b)(11).

ing clause is central to the defendants' motion.

In addition to these three provisions enacted by Congress, there is a fourth federal pronouncement critical to the defendants' motion. This pronouncement, which was promulgated by a federal agency, is contained in the Hazard Communication Standard ("HazCom Standard"), 29 C.F.R. § 1910.1200. As noted, Congress, in the OSH Act, directed the Secretary of Labor to promulgate national occupational safety and health standards. In 1974, the Secretary "appointed an advisory committee to develop the standards for implementation of the statutory provision requiring labels or other appropriate forms of warning" regarding hazardous materials in the workplace. *Ohio Mfrs. Ass'n v. City of Akron*, 801 F.2d 824, 827 (6th Cir.1986) (citing 29 U.S.C. § 655(b)(7)[4]). Ultimately, in 1985, the Secretary, through OSHA, promulgated the HazCom Standard. *See id.* at 827 (discussing the history of the HazCom Standard); *Gade*, 505 U.S. at 92, 112 S.Ct. 2374 (noting the Secretary delegated certain authority to OSHA). The announced purpose of the HazCom Standard was "to ensure that the hazards of all chemicals produced or imported are evaluated, and that information concerning their

hazards is transmitted to employers and employees." 29 C.F.R. § 1910.1200(a)(2). To achieve this end, the HazCom Standard directs as follows:

a. chemical manufacturers are first required to "evaluate chemicals produced in their workplaces or imported by them to determine if they are hazardous," *id.* § 1910.1200(d)(1), and this evaluation must start with certain lists of known hazardous chemicals, *id.* § 1910.1200(d)(3–4);

b. chemical manufacturers must then "obtain or develop a material safety data sheet ['MSDS'] for each hazardous chemical they produce or import," *id.* § 1910.1200(g)(1); this MSDS must list the identity of, and physical and health hazards posed by, each hazardous chemical, *id.* § 1910.1200(g)(2)(i–iv);

c. the chemical manufacturer must distribute these MSDSs to all "downstream employers," *id.* § 1910.1200(a)(2), and all employers (including the original chemical manufacturer) must ensure the MSDS is available to their employees, *id.* § 1910.1200(g)(8);[5] and

---

4. 29 U.S.C. § 655(b)(7) provides that "[a]ny standard promulgated under this subsection shall prescribe the use of labels or other appropriate forms of warning as are necessary to insure that employees are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions of safe use or exposure."

5. The HazCom Standard, like the OSH Act itself, is directed at *employers* and *employees*—that is, the traditional workplace. Thus, the HazCom Standard does not obligate a manufacturer or distributor to supply MSDS's to end-use *consumers*. The HazCom Standard only obligates the original chemical manufacturer (Employer A) to create a MSDS for any hazardous chemical that it produces

and, when the manufacturer ships the chemical to a commercial customer or distributor (Employer B), to send the MSDS to Employer B. If Employer B then ships the chemical to another firm, Employer C, it is Employer B's responsibility to pass the MSDS "downstream" to Employer C. The obligation of a distributor to convey a MSDS, however, extends only to employees and "downstream employers;" it does not extend to a non-employee, end-use consumer. *See generally* 29 C.F.R. §§ 1910.1200(g)(6–8). Indeed, the obligations of the original chemical manufacturer are imposed only by virtue of its role as *employer. See id.* § 1900.1200(c) (" 'Chemical manufacturer' means an employer with a workplace where chemical(s) are produced for use or distribution").

d. in addition to the development and distribution of MSDSs, a chemical manufacturer must also "ensure that each container of hazardous chemicals leaving the workplace is labeled, tagged or marked with ... [i] [the] [i]dentity of the hazardous chemical(s); [ii] [a]ppropriate hazard warnings; and [iii] [the] [n]ame and address of the chemical manufacturer, importer, or other responsible party," *id.* § 1910.1200(f)(1).

The HazCom Standard defines the term "chemical" extremely broadly—"any element, chemical compound or mixture of elements and/or compounds"—so there is no question but that the welding products at issue in this litigation are "chemicals" subject to the HazCom standard. *Id.* § 1910.1200(c).[6]

Pivotal to the defendants' motion is a sentence contained in the "purpose" section of the HazCom Standard. OSHA declares that the HazCom Standard "is intended to address *comprehensively* the issue of evaluating the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures to employees, *and to preempt any legal requirements of a state, or political subdivision of a state, pertaining to this subject.*" *Id.* § 1910.1200(a)(2) (emphasis added). The defendants submit that this HazCom Standard pre-emption provision prohibits the plaintiffs, as a matter of law, from

asserting claims "premised on Defendants' failure to evaluate, identify, and communicate the risks of welding fumes." Motion at 18. To assess this argument, the Court must first examine the current state of the law of federal pre-emption.

## II. Pre-emption.

Federal pre-emption of state law is based on the Supremacy Clause of the United States Constitution, which declares that the "Constitution and the Laws of the United States ... shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.[7] The Supreme Court has explained that "[p]re-emption may be either expressed or implied," meaning that the dominating federal "command" displacing state law may be either "explicitly stated in the [federal] statute's language or implicitly contained in its structure and purpose." *Gade,* 505 U.S. at 98, 112 S.Ct. 2374 (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)).

Express pre-emption may occur when the explicit "command" comes directly from Congress and also, in certain circumstances, from a federal agency. An example of the former is the Federal Meat Inspection Act, where Congress stated: "[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State." *Jones v. Rath Packing Co.,* 430 U.S. 519, 530 n.

---

6. *See* 29 C.F.R. §§ 1910.1000 Table Z–1, 1915.1000 Table Z, 1926.55 App. A (setting limits on an employee's exposure to different types of "air contaminants," including "manganese compounds" and "manganese fume"). The HazCom Standard specifically exempts certain products, however, that are already regulated by other federal statutes. *See, e.g., id.* § 1910.1200(b)(5–6) (exempting, inter alia, tobacco, food, alcohol, pesticides, drugs, and cosmetics).

7. Federal pre-emption also derives from the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18. *See City of Columbus v. Ours Garage and Wrecker Service, Inc.,* 536 U.S. 424, 439, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002) ("[t]his case ... deals ... with preemption stemming from Congress' power to regulate commerce"); *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 324, 4 L.Ed. 579 (1819) ("Congress is authorized to pass all laws 'necessary and proper' to carry into execution the powers conferred on it").

17, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (quoting 25 U.S.C. § 678). The Supreme Court easily concluded that, with this provision, Congress intended to pre-empt California state labeling laws that (unlike federal labeling law) did not allow for "[weight] variations caused by moisture loss." *Id.* at 532, 97 S.Ct. 1305 (emphasis added). An example of the latter occurred when the Federal Home Loan Bank Board promulgated a regulation dictating that certain banking practices "shall be governed exclusively by the Board's regulations in pre-emption of and without regard to any limitations imposed by state law." *Fidelity Federal Sav. and Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 158–59, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (quoting 12 C.F.R. § 556.9(f)(2)). The Supreme Court concluded that this agency regulation pre-empted state law because the Board had "reasonably exercised the authority, given it by Congress," and "intended to pre-empt conflicting state restrictions." *Id.* at 170, 102 S.Ct. 3014. The Court ruled that a federal agency may, through its regulations, explicitly pre-empt state law, so long as the agency acted within the scope of the authority that Congress delegated to it. *Id.*

■■■ Express pre-emption is relatively easy to spot. The Supreme Court has further ruled, however, that, even when neither Congress nor a federal agency has stated *expressly* an intention to pre-empt state law, pre-emption may still be *implied.* "Absent explicit pre-emptive language, we have recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' and conflict pre-emption, where 'compliance with both federal and state regulations is a physical impossibility' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes

and objectives of Congress.'" *Gade,* 505 U.S. at 98, 112 S.Ct. 2374 (citations omitted) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), and *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)); *see Sprietsma v. Mercury Marine,* 537 U.S. 51, 64, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) ("a federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, or when state law is in actual conflict with federal law").

For example, the Supreme Court concluded that, even though Congress did not state explicitly it meant to pre-empt state law regarding branding of foods when it enacted the Food and Drugs Act, state labeling laws were impliedly pre-empted when compliance therewith had "a direct effect to impair the efficient exercise of" federal law. *McDermott v. Wisconsin,* 228 U.S. 115, 137, 33 S.Ct. 431, 57 L.Ed. 754 (1913). Similarly, in *Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), the Court noted that, although Congress did not include an express pre-emption provision in the Medical Devices Amendments to the Food, Drug, and Cosmetic Act, Congress had delegated broad authority to the Food and Drug Administration ("FDA") to regulate medical devices, and the FDA's regulations specifically addressed the issue of fraudulent disclosures by companies seeking to market medical devices. *Id.* at 348–49, 121 S.Ct. 1012. Given the federal agency's "comprehensive" regulations in this area, the Supreme Court held that "state-law fraud-on-the-FDA claims" were impliedly pre-empted because they would "inevitably conflict with the FDA's responsibility." *Id.* at 350, 121 S.Ct. 1012. Again, both Congressional laws and feder-

al agency regulations can impliedly pre-empt state law.

An interesting—and difficult—aspect of federal pre-emption analysis is that, even when Congress states its intentions *expressly*, pre-emption may still be *implied*. The Supreme Court recently explained:

> Congress' inclusion of an express pre-emption clause "does *not* bar the ordinary working of conflict pre-emption principles" that find implied pre-emption "where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Sprietsma*, 537 U.S. at 65, 123 S.Ct. 518 (emphasis in original, citations omitted) (quoting *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), and *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995)).[8] An example of this type of implied conflict pre-emption occurred in *Geier*, where the Court examined the National Traffic and Motor Vehicle Safety Act. Congress included in the Act an express pre-emption provision, stating: "no State ... shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment[,] any safety standard ... which is not identical to the Federal standard." *Geier*, 529 U.S. at 868, 120 S.Ct. 1913

(quoting 15 U.S.C. § 1392(d)). Congress also included in the Motor Vehicle Safety Act a "saving clause," which stated that " '[c]ompliance with' a federal safety standard 'does not exempt any person from any liability under common law.' " *Id.* (quoting 15 U.S.C. § 1397(k)). The Court held that the express pre-emption provision, read in light of the saving clause, did *not* pre-empt a common law tort action alleging an automobile manufacturer was negligent in failing to equip a vehicle with an airbag. But the Court went on to use the following reasoning to hold that, nonetheless, the Act *impliedly* pre-empted the state law tort claim: (1) "the saving clause (like the express pre-emption provision) does *not* bar the ordinary working of conflict pre-emption principles, *id.* at 869, 120 S.Ct. 1913 (emphasis in original); (2) "a common-law 'no airbag' action" would, in fact, "actually conflict[ ] with" federal regulations, *id.* at 874, 120 S.Ct. 1913, because imposition of "a duty to install an airbag" would create "an obstacle to the gradual passive restraint phase-in that the federal regulation deliberately imposed," " *id.* at 881, 120 S.Ct. 1913; and (3) courts must infer pre-emption of a tort action "in cases of actual conflict," *id.* at 886, 120 S.Ct. 1913.

■ Thus, even when Congress states expressly what aspects of state law it means to pre-empt, courts must still infer pre-emption beyond the confines of Congress's statements if state law actually conflicts with federal law. And this infer-

---

**8.** The Supreme Court has summarized all the different species of pre-emption this way: "Pre-emption occurs when [1] Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, [2] when there is outright or actual conflict between federal and state law, [3] where compliance with both federal and state law is in effect physically impossible, [4] where there is implicit in federal law a barrier to state regulation, [5] where Congress has legislated comprehensively, thus occupying an entire field of regu-

lation and leaving no room for the States to supplement federal law, or [6] where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Louisiana Public Service Comm'n v. F.C.C.*, 476 U.S. 355, 369–70, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (citations omitted).

ence is appropriate even "in light of the presumption against the pre-emption of state police power regulations." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *see Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) ("we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress").

The *Geier* case illustrates how difficult application of federal pre-emption doctrine can be. The Supreme Court repeats often the mantra that "the purpose of Congress is the ultimate touchstone of pre-emption analysis," [9] but the Supreme Court has also long noted that it is "often a perplexing question whether Congress has precluded state action or by the choice of selective regulatory measures has left the police power of the States undisturbed except as the state and federal regulations collide." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230–31, 67 S.Ct. 1146, 91

L.Ed. 1447 (1947); *see International Ass'n of Machinists v. Gonzales*, 356 U.S. 617, 619, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958) (discussing pre-emption generally and admitting that "the statutory implications concerning what has been taken from the States and what has been left to them are of a Delphic nature"); *Geier*, 529 U.S. at 873, 120 S.Ct. 1913 (our "well-established pre-emption principles ... are difficult to apply").[10]

In the context of lawsuits asserting product liability torts, such as this MDL, recent Supreme Court precedent reveals that divining Congressional intent becomes even more difficult. Prior to deciding *Cipollone* in 1992, the Supreme Court had discussed federal pre-emption theory almost exclusively in the context of examining the continued validity of state-enacted statutes and regulations—not state common law claims. The pre–1992 Supreme Court pre-emption cases that did address common law claims suggested that federal law normally did not pre-empt state law torts.[11] Indeed, in 1990—only two years

---

9. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (internal quotation marks omitted).

10. *See also Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) ("There is not—and from the very nature of the problem there cannot be—any rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress. This Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula.") (footnote omitted).

11. In *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), the Court held that the Atomic Energy Act did not pre-empt punitive damage awards connected to state-law negligence claims. In *International Paper Co. v. Ouellette*, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987), the Court held that the Clean Water Act did not pre-empt state-law claims for nuisance (although state courts were required to apply the law of the state where the alleged nuisance originated). And in *English v. Gen. Elec. Co.*, 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), the Court held that the Energy Reorganization Act did not pre-empt a state law claim for intentional infliction of emotional distress. The only pre-*Cipollone* cases where the Supreme Court found pre-emption of a state common law claim rested largely on the unusually broad pre-emptive scope of the Labor Management Relations Act ("LMRA"). *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) (LMRA and National Labor Relations Board regulations pre-empted a

before *Cipollone*—the Supreme Court re-affirmed its reluctance to use federal pre-emption theory to displace common law. Even though the Court had earlier concluded that "the Federal Government has occupied the entire field of nuclear safety concerns," *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. 190, 212, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), the Court held that a tort claim by a nuclear laboratory whistleblower was not pre-empted. *English v. Gen. Elec. Co.,* 496 U.S. 72, 80, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). The basis for the Court's conclusion was that the effect of an award of damages "is neither direct nor substantial enough to place petitioner's claim in the pre-empted field." *Id.* at 85, 110 S.Ct. 2270 (1990).

In 1992, however, the Supreme Court broke from its traditional reluctance to find pre-emption of common law tort claims. In *Cipollone,* the Court examined the pre-emptive scope of the Federal Cigarette Labeling and Advertising Act, which dictated the well-known warnings found on cigarette packs. In the 1969 Act, Congress had provided that state law could impose "[n]o requirement or prohibition" with respect to cigarette advertising. *Cipollone,* 505 U.S. at 515, 112 S.Ct. 2608 (quoting 15 U.S.C. § 1334(b)). The Court believed that, with this pre-emption provision, "Congress was primarily concerned with positive enactments by States." *Id.* at 521, 112 S.Ct. 2608. But the Court concluded that the pre-emptive scope of the Advertising Act could also reach state common law. The critical language in the Court's plurality opinion was as follows:

[C]ommon-law damages actions of the sort raised by petitioner are premised on the existence of a legal duty, and it is difficult to say that such actions do not impose "requirements or prohibitions." * * * Whereas the common law would not normally require a vendor to use any specific *statement* on its packages or in its advertisements, it is the essence of the common law to enforce duties that are either affirmative *requirements* or negative *prohibitions.* We therefore reject petitioner's argument that the phrase "requirement or prohibition" limits the 1969 Act's pre-emptive scope to positive enactments by legislatures and agencies.

*Id.* at 522, 112 S.Ct. 2608 (emphasis in original, citations omitted) (plurality opinion); *see id.* at 548–549, 112 S.Ct. 2608 (Scalia, J., joined by Thomas, J., concurring in this part of the judgment). Still, the Court applied the pre-emptive knife with a light touch—the Court ultimately concluded that Congress had expressly pre-empted tort claims against cigarette manufacturers for inadequate health warnings, but did not pre-empt tort claims for breach of express warranty, misrepresentation, or conspiracy. *Id.* at 530–31, 112 S.Ct. 2608.

Unfortunately, the *Cipollone* court was deeply fractured, producing three opinions; the Justices were simply unable to reach a majority opinion on what "Congress intended." Indeed, one of the few things upon which a majority of the Justices did agree was "the difficulty lower courts will encounter in attempting to implement today's decision." *Cipollone,* 505 U.S. at 543–44, 112 S.Ct. 2608 (Blackmun, J., concurring in part and dissenting in part,

tort claim for picketing); *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (LMRA pre-empted a tort claim for bad faith handling of insurance claim); *United Steelworkers of America, AFL–* *CIO–CLC v. Rawson,* 495 U.S. 362, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990) (LMRA pre-empted tort action alleging union representatives were negligent in the inspection of a mine).

joined by Justices Kennedy and Souter); *id.* at 555, 112 S.Ct. 2608 (Scalia, J., concurring in part and dissenting in part, joined by Justice Thomas) (quoting Justice Blackmun, and adding that "[a] disposition that raises more questions than it answers does not serve the country well").

Unsurprisingly, defendants across the country seized upon *Cipollone* and asserted that different federal laws and regulations pre-empted plaintiffs' state law tort claims. In the 13 years since it decided *Cipollone,* the Supreme Court has issued at least eight additional opinions addressing whether specific federal laws pre-empted state common law torts.[12] In at least one of these cases, the Supreme Court remained deeply fractured.[13] Many commentators believe these cases did little to cure the confusion that Justices Blackmun and Scalia predicted.[14]

**12.** *See CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (holding that the Federal Railroad Safety Act did not pre-empt a claim against a railroad company for failure to use adequate warning devices, but did pre-empt a claim for operating at excessive speed); *Freightliner Corp. v. Myrick,* 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (holding that the National Traffic and Motor Vehicle Safety Act did not pre-empt a common law design defect claim related to a truck that did not have anti-lock brakes); *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (holding that the Medical Devices Act did not pre-empt state law claims of defective design or defective labeling); *AT & T Co. v. Central Office Telephone, Inc.,* 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (holding that the Communications Act pre-empted a claim for tortious interference with contract against a telephone company); *Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000) (distinguishing *Easterwood* and holding that the Federal Railroad Safety Act did pre-empt a claim against a railroad company for failure to use adequate warning devices, where the warning devices were paid for with federal funds and met federal requirements); *Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (holding that Department of Transportation regulations pre-empted a state law claim for failure to install airbags as safety equipment); *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (holding that the Medical Devices Amendments to the Food, Drug, and Cosmetic Act pre-empted a claim for fraud on the FDA); *Sprietsma v. Mercury Marine,* 537 U.S. 51, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) (holding that the Federal Boat Safety Act did not pre-empt common law claims for failure to install propellor guards as safety equipment).

**13.** As in *Cipollone,* the Supreme Court in *Medtronic* delivered a fractured plurality opinion that is not easy to comprehend. As the Sixth Circuit Court of Appeals later noted, "[t]he various courts of appeals that have confronted issues of preemption arising under the MDA have struggled mightily with *Lohr's* language in the effort to discern its holding." *Kemp v. Medtronic, Inc.,* 231 F.3d 216, 224 (6th Cir.2000), *cert. denied,* 534 U.S. 818, 122 S.Ct. 48, 151 L.Ed.2d 19 (2001). In their motion to dismiss, the defendants rely most heavily on the *Cipollone* and *Medtronic* plurality opinions.

**14.** *See, e.g.,* Richard C. Ausness, *Preemption of State Tort Law by Federal Safety Statutes: Supreme Court Preemption Jurisprudence Since* Cipollone, 92 Ky. L.J. 913, 916, 968 (2003–04) ("the Court's preemption jurisprudence appears to be bereft of any coherent theory or methodology" and "is in a terrible state"); Jean M. Eggen, *Shedding Light on the Preemption Doctrine in Product Liability Actions: Defining the Scope of* Buckman *and* Sprietsma, 6 Del. L.Rev. 143, 143 (2003) ("Courts of Appeals have been relatively unsuccessful at predicting the Supreme Court's position on these preemption issues"); David G. Owen, *Federal Preemption of Product Liability Claims,* 55 S.C.L.Rev. 411, 441 (Winter 2003) ("As a practical matter, there is just no simple route out of the preemption thicket in which we now are largely lost"); Stacey A. Carroll, Note, *Federal Preemption of State Products Liability Claims: Adding Clarity and Respect for Sovereignty to the Analysis of Federal Preemption Defenses,* 36 Ga. L.Rev. 797, 819 (Spring 2002) ("The Supreme Court's recent jurisprudence—from *Cipollone* to *Geier*—... [is] unpredictable and analytically inconsistent"); Viet D. Dinh, *Reassessing the Law of*

This Court believes, however, that a careful reading of *Cipollone* and its progeny yields a body of rules that seem to fairly instruct this Court's ultimate conclusion: the plaintiffs' failure-to-warn claims in this MDL are not pre-empted by the OSH Act or related federal regulations. By comparing and contrasting the circumstances in this case with those in the Supreme Court's recent pre-emption cases, it becomes apparent that Congress did not *expressly* pre-empt state law claims for failure to warn, nor are such claims *impliedly* pre-empted due to conflict with federal law.[15]

As a starting point, the Supreme Court remains firmly committed to the rule that " '[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240 (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963), and citing *Cipollone*, 505 U.S. at 516, 112 S.Ct. 2608, and *Gade*, 505 U.S. at 96, 112 S.Ct. 2374). Congress's intent is discerned primarily "from the language of the pre-emption statute and the 'statutory framework' surrounding it." *Id.* (quoting *Gade*, 505 U.S. at 111, 112 S.Ct. 2374 (Kennedy, J., concurring in part and concurring in judgment)). But Congressional intent is also revealed by the "structure and purpose of the statute as a whole," as well as a "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.*

■ Furthermore, the Supreme Court continues to hold that a pre-emption analysis must begin "with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240; *City of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424, 432–33, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002). This assumption holds true "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied.' " *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240 (quoting *Rice*, 331 U.S. at 230, 67 S.Ct. 1146). And the assumption against federal pre-emption of the States' police powers applies not only to the question of whether Con-

---

*Preemption*, 88 Geo. L.J.2085, 2085 (2000) ("the Supreme Court's numerous preemption cases follow no predictable jurisdictional or analytical pattern"); Caleb Nelson, *Preemption*, 86 Va. L.Rev. 225, 232 (2000) ("Most commentators who write about preemption agree on one thing: Modern preemption jurisprudence is a muddle"); Betsy J. Grey, *Make Congress Speak Clearly: Federal Preemption of State Tort Remedies*, 77 B.U. L.Rev. 559, 588 (1997) (referring to the Supreme Court's "schizophrenia" and noting that "[t]he changing climate within the Supreme Court as to federal preemption of state tort claims has left lower court decisions in disarray"); Lars Noah, *Reconceptualizing Federal Preemption of Tort Claims as the Government Standards Defense*, 37 Wm. & Mary L.Rev. 903, 926 (Spring 1996) ("lower courts have struggled to apply the [*Cipollone*] plurality's judgment in other contexts").

15. "Because a variety of state laws and regulations may conflict with a federal statute, whether because a private party cannot comply with both sets of provisions or because the objectives of the federal statute are frustrated, 'field pre-emption may be understood as a species of conflict pre-emption.' " *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 n. 6, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (quoting *English v. General Elec. Co.*, 496 U.S. at 79 n. 5, 110 S.Ct. 2270). This Court finds that no specie of conflict pre-emption arises in this case—Congress did not "pre-empt the field" of chemical labeling or warnings, it is not "impossible" for defendants to comply with both the HazCom Standard and separate common law duties, and state law does not "stand as an obstacle" to full federal regulation. *Gade*, 505 U.S. at 98, 112 S.Ct. 2374.

gress intended pre-emption at all, but also to the scope of any pre-emption that Congress did intend. *Id.* (rejecting arguments made by Justice Scalia in *Cipollone,* 505 U.S. at 545–546, 112 S.Ct. 2608). Thus, express pre-emption provisions that displace the power of a State to protect the health and safety of its residents should generally be given "a narrow interpretation." *Id.* The presumption against pre-emption often yields the result that, even if some varieties of tort are pre-empted, others are not. *E.g., Cipollone,* 505 U.S. at 530–31, 112 S.Ct. 2608 (claim for failure to warn pre-empted, but claims for breach of express warranty, misrepresentation, and conspiracy not pre-empted); *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (claim for excessive speed pre-empted, but claim for inadequate warning not pre-empted).[16]

 Third, the presence of a saving clause in a federal statute provides strong evidence that Congress did not intend to pre-empt all state law torts, so the doctrine of federal pre-emption should be given very narrow application: a "saving clause assumes that there are some significant number of common-law liability cases to save." *Sprietsma,* 537 U.S. at 63, 123 S.Ct. 518 (quoting *Geier,* 529 U.S. at 868, 120 S.Ct. 1913). This is especially true where "[t]he language of the pre-emption provision permits a narrow reading that excludes common-law actions." *Id.* On the other hand, neither an express pre-emption provision nor an explicit sav-

ing clause preclude application of the doctrine of implied pre-emption, especially if "the language of the saving clause [does not] suggest[ ] an intent to save state-law tort actions that conflict with federal regulations." *Geier,* 529 U.S. at 870, 120 S.Ct. 1913.

Fourth, when examining the pre-emptive scope of federal regulations promulgated by a federal agency pursuant to Congressional authorization, the Supreme Court has looked very carefully at the details of the regulatory scheme. For example, after handing down *Cipollone,* the Supreme Court twice examined the degree to which the Federal Railroad Safety Act pre-empts common law tort claims. *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993); *Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000). In *Easterwood,* the plaintiff asserted, inter alia, a claim for failure to post adequate warning signs at a railroad crossing. After examining the federal regulations promulgated by the Federal Railroad Administration and the Federal Highway Administration, the Court concluded that this claim was not pre-empted. Subsequently, in *Shanklin,* another plaintiff brought a claim for failure to post adequate warning signs at a railroad crossing; unlike in *Easterwood,* however, the warning signs in *Shanklin* had been installed using federal funds.

In response to a pre-emption challenge by the defendant, the Sixth Circuit Court of Appeals applied *Easterwood* and held that the *Shanklin* plaintiff's tort law claim remained viable.[17] The Supreme Court

---

16. This presumption against pre-emption applies against both express pre-emption and also implied "field" pre-emption. *See Rice,* 331 U.S. at 230, 67 S.Ct. 1146 (congressional occupation of the field is not to be presumed "in a field which the States have traditionally occupied"); *cf. Boyle v. United Technologies Corp.,* 487 U.S. 500, 507–508, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) ("In an area of uniquely federal interest," "[t]he conflict with

federal policy need not be as sharp as that which must exist for ordinary pre-emption"). *See American Ins. Ass'n v. Garamendi,* 539 U.S. 396, 420 n. 11, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (quoting *Boyle* ).

17. *Shanklin v. Norfolk Southern Ry. Co.,* 173 F.3d 386 (6th Cir.1999). The Sixth Circuit adopted the Seventh Circuit's interpretation of *Easterwood,* rejecting the interpretation

reversed, again carefully examining the precise scope and subject matter of the federal regulations and defining the exact "requirements" and "terms" the regulations established. *Shanklin*, 529 U.S. at 352–53, 120 S.Ct. 1467. *Shanklin* teaches that, when federal regulations are cited as the basis for preemption, a court must examine especially carefully what the regulations require. *See also Medtronic*, 518 U.S. at 500, 116 S.Ct. 2240 (rejecting a defense of federal pre-emption of state tort claims, after parsing the applicable federal regulations, because the "over-arching concern" of the regulations was that "preemption occur only where a *particular* state requirement threatens to interfere with a *specific* federal interest") (emphasis added). Only when state law actually and directly conflicts with the federal regulations is pre-emption appropriate.

■■■ And finally, the intent of Congress regarding the pre-emptive scope of its enactments cannot be overridden by a federal agency to which Congress assigned regulatory authority. Put differently, "a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority." *Louisiana Public Service Comm'n v. F.C.C.*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). This is true "for at least two reasons:"

> First, an agency literally has no power to act, let alone pre-empt the validly enacted legislation [or common law] of a sovereign State, unless and until Congress confers power upon it. Second, the best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency. * * * An agency may not confer power upon itself. To permit an agency to expand its power in the face of

a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress. *Id.* at 374–75, 106 S.Ct. 1890. In the context of this case, this last rule cautions that the pre-emptive effect of the HazCom Standard (or any other regulation promulgated by OSHA) cannot exceed the preemptive reach of the enabling statute—the OSH Act—that was intended by Congress.

## III. Analysis.

### A. *Gade v. National Solid Wastes Management Ass'n.*

This Court's pre-emption analysis must begin with *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). Although *Gade* examined the pre-emptive effect of the OSH Act only on positive state enactments, not common law tort claims, *Gade* still provides an important analytical starting point.

The plaintiff in *Gade* sought to enjoin the Illinois Environmental Protection Agency from enforcing state laws providing for licensure of hazardous waste site workers. The plaintiff asserted that the Illinois licensing law was pre-empted by the OSH Act, because OSHA had promulgated regulations setting standards for the training of workers who handle hazardous wastes. *See* 29 C.F.R. § 1910.120(e). The Supreme Court ultimately agreed, holding that "nonapproved state regulation of occupational safety and health issues for which a federal standard is in effect is impliedly pre-empted." *Id.* at 99–100, 112 S.Ct. 2374.

The Court based its conclusion on Congress's overarching intent, which was "to avoid subjecting workers and employers to duplicative regulation." *Id.* at 100, 112 S.Ct. 2374. The Court noted that, to achieve this goal, Congress had included

---

adopted by the Fifth, Eighth, and Tenth Circuits. *Id.* at 391–395.

29 U.S.C. § 667(a), which saves from pre-emption any state law regulating "any occupational safety or health issue with respect to which no standard is in effect." The Court noted that, "although this is a saving clause," § 667(a)'s "preservation of state authority in the absence of a federal standard presupposes a background pre-emption of all state occupational safety and health standards whenever a federal standard governing the same issue is in effect." *Id.* at 100, 112 S.Ct. 2374.

Given this "background pre-emption" by the OSH Act, the "key question" became: "at what point [does] the state regulation sufficiently interfere[ ] with federal regulation [such] that it should be deemed pre-empted under the Act"? *Id.* at 107, 112 S.Ct. 2374. The Court provided this answer:

> In the decision below, the Court of appeals ... [held] that, in the absence of the approval of the Secretary, the OSH Act pre-empts all state law that "constitutes, in a direct, clear and substantial way, regulation of worker health and safety." [*National Solid Wastes Management Ass'n v. Killian*, 918 F.2d 671, 679 (7th Cir.1990) ]. We agree that this is the appropriate standard for determining OSH Act pre-emption. On the other hand, state laws of general applicability (such as laws regarding. traffic safety or fire safety) that do not conflict with OSHA standards and that regulate the conduct of workers and nonworkers alike would generally not be pre-empted. Although some laws of general applicability may have a "direct and substan-

tial" effect on worker safety, they cannot fairly be characterized as "occupational" standards, because they regulate workers simply as members of the general public. In this case, we agree with the court below that a law directed at workplace safety is not saved from pre-emption simply because the State can demonstrate some additional effect outside of the workplace.

*Id.* at 107, 112 S.Ct. 2374.[18] Because the Illinois regulations directly and clearly regulated the safety of hazardous waste site workers, the Court found these regulations were pre-empted.

■ In spite of the Supreme Court's conclusion in *Gade* that the OSH Act impliedly pre-empted a positive state standard that conflicted with an OSHA regulation, this Court concludes the OSH Act does *not* pre-empt common law claims for failure to warn. Unlike the defendant in *Gade*, the MDL defendants in this case assert that Congress intended to pre-empt common law torts, not positive state enactments. This difference is critical, for the following three reasons.

### 1. The Duty to Warn Invoked by Plaintiffs in this MDL Is "Generally Applicable."

As the Supreme Court was careful to note in *Gade*, tort law is "of general applicability" and "regulate[s] the conduct of workers and nonworkers alike." *Id.* at 107, 112 S.Ct. 2374. Given that the duty to warn is not specific to the employer/employee arena, at which the OSH Act is explicitly directed,[19] tort law based on this

---

**18.** *See also id.* at 111, 112 S.Ct. 2374 (Kennedy, J., concurring in part) ("I agree with the Court that the OSH Act pre-empts all state occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated") (internal quotation marks omitted); *id.* at 114, 112 S.Ct. 2374 (Kennedy, J., concurring in part) ("I

agree with the Court that state laws of general applicability are not pre-empted").

**19.** *See Minichello v. U.S. Industries, Inc.*, 756 F.2d 26, 29 (6th Cir.1985) ("OSHA regulations pertain only to employers' conduct. U.S. Industries was not Minichello's employer; the Ford Motor Company was. The OSHA regulations, then, do not even apply to

duty "would generally not be pre-empted"—imposition of a common-law duty to warn "cannot fairly be characterized as [an] 'occupational' standard[ ], because [it] regulate[s] workers [and employers] simply as members of the general public." *Id.* In other words, whereas the Illinois licensing regulation discussed in *Gade* was directed specifically at the "workplace safety" of personnel handling hazardous waste, the common-law duty to warn relied upon by plaintiffs in this case is independent of the plaintiffs' status as employees in a workplace.

Indeed, although it is a pre-*Cipollone* case, the First Circuit Court of Appeals adopted precisely this position in *Pedraza v. Shell Oil Co.*, 942 F.2d 48 (1st Cir. 1991). In *Pedraza,* the plaintiff brought several tort claims against his employer after he inhaled a toxic chemical and developed asthma. The defendant argued the tort claims were pre-empted by the OSH Act, and the district court agreed. The First Circuit reversed. Although the *Pedraza* court "discern[ed] in [the OSH Act's] language, structure and context a clear congressional signal" to pre-empt "state jurisdiction in the development and enforcement of *standards* relating to occupational health and safety" (emphasis added), the court found "no warrant whatever for an interpretation which would preempt enforcement in the workplace of private rights and remedies traditionally afforded by state laws of general application." *Id.* at 52–53.

The *Pedraza* court noted that common law torts were "less an arrogation of regulatory jurisdiction over an 'occupational safety or health issue' " than a neutral forum for the orderly adjustment of private disputes between, among others, the

the relationship between U.S. Industries and Minichello, which was that of producer and consumer.") (citations omitted).

users and suppliers of toxic substances." *Id.* at 53. Congress, with the OSH Act's saving clause, "expressly stated that [the Act] was not intended to pre-empt state tort law even though tort liability might "operate to regulate workplace conduct and implicitly set safety standards." *Id.* at 54 (citing *People v. Chicago Magnet Wire Corp.*, 126 Ill.2d 356, 128 Ill.Dec. 517, 534 N.E.2d 962, 968 (1989), *cert. denied sub nom Asta v. Illinois*, 493 U.S. 809, 110 S.Ct. 52, 107 L.Ed.2d 21 (1989)). The MDL defendants suggest that this statement in *Pedraza* is no longer persuasive, in light of *Cipollone.* But the Supreme Court, itself, earlier hinted it held the same view. A few years after Congress passed the OSH Act, the Court noted that, even though OSHA can issue abatement orders and impose civil penalties on employers, and even though these options exist regardless of whether "an employee is actually injured or killed," all "existing state statutory and common-law remedies for actual injury and death remain unaffected." *Atlas Roofing Co., Inc. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 445, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977). *Cipollone* does not suggest this view has changed, and lower courts applying the Supreme Court's more recent pre-emption cases uniformly reach the same result. *See, e.g., Wickham v. American Tokyo Kasei, Inc.*, 927 F.Supp. 293 (N.D.Ill.1996) (applying *Pedraza* in a post-*Cipollone* case and concluding that the OSH Act did not preempt state law claims for failure to warn); *Fullen v. Philips Electronics North Am. Corp.*, 266 F.Supp.2d 471 (N.D.W.Va.2002) (remanding a case to state court upon concluding that the HazCom Standard did not completely pre-empt state law tort claims, including claims for failure to warn and fraudulent concealment).[20]

20. *See also Anderson v. Airco, Inc.*, 2003 WL 21842085 (D.Del. July 28, 2003) (remanding a case to state court upon concluding that the HazCom Standard did not completely pre-

In sum, *Gade* is easily distinguished because the duties upon which the plaintiffs in this case rest their claims against the defendants are imposed by common law of "general applicability," not positive state regulation setting particularized "occupational standards."

## 2. The Saving Clause was Virtually Irrelevant in *Gade*.

■ The OSH Act's saving clause was not implicated in *Gade*, but it is directly implicated here. The saving clause provides that nothing about the OSH Act "shall be construed [1] to supersede or in any manner affect any workmen's compensation law or [2] to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment." 29 U.S.C. §§ 653(b)(4). Given that the licensing scheme challenged in *Gade* was a positive state enactment setting occupational standards, this saving clause was virtually irrelevant to the Supreme Court's pre-emption analysis; but the clause speaks directly to the claims asserted by the MDL plaintiffs here.

This Court's review of saving clauses included in other Congressional enactments, as discussed by the Supreme Court in the context of pre-emption, reveals that no other enactment contains a saving clause more broad.[21] Congress was care-

empt state law tort claims, including a claim for failure to warn); *Washington v. Falco S & D. Inc.*, 1996 WL 627999 (E.D.La. Oct.29, 1996) (same); *York v. Union Carbide Corp.*, 586 N.E.2d 861, 866 (Ind.Ct.App.1992) ("we agree with the *Pedraza* court's holding that the savings clause operates to exempt tort law claims from preemption"); *Jones v. Cincinnati, Inc.*, 32 Mass.App.Ct. 365, 589 N.E.2d 335 (1992), *review denied,* 412 Mass. 1105, 595 N.E.2d 326 (1992) (rejecting claim that OSHA regulations pre-empt product liability claims); *Dukes v. Sirius Const., Inc.*, 316 Mont. 226, 73 P.3d 781, 786–95 (2003) (concluding that the HazCom Standard did not pre-empt state tort claims expressly, impliedly by occupying the field, or impliedly due to actual conflict); *and see* David G. Owen, *Products Liability Law,* § 14.4 at 919 (West 2005) ("[w]hen the savings clause is considered together with the fact that OSHA applies only to employers, not manufacturers, it is difficult to escape the conclusion that OSHA does not preempt injury claims against manufacturers of products in the workplace"). Indeed, although it did so in an unreported case that pre-dates *Cipollone,* the Sixth Circuit Court of Appeals cited *Pedraza* with approval and stated: "It is well-established that OSHA does not preempt state tort law." *Williams v. J.I. Case Co.,* 963 F.2d 374, 1992 WL 111809 at *2 (6th Cir. May 22, 1992).

The many lower court cases cited by defendants for the proposition that the HazCom Standard expressly pre-empts "issues relating to the evaluation and communication of the potential hazards of chemicals," motion at 9, all address state regulatory schemes, not common law torts. The only exception is *Torres–Rios v. LPS Labs., Inc.,* 152 F.3d 11 (1st Cir.1998), but even this case provides little support for defendants' position. The *Torres–Rios* court examined the plaintiff's failure-to-warn claim *on the merits,* and concluded the warnings were satisfactory as a matter of law. *Id.* at 13–15 (holding that, despite plaintiff's unhappiness about small type-size, lack of Spanish, and lack of certain details, "there is no material dispute of fact concerning the adequacy of the warnings"). The *Torres–Rios* court did *not* undertake a pre-emption analysis, mentioning the term only once, although the court did state that the full extent of the defendant's obligation was to comply with federal regulatory duties.

**21.** *Cf. Sprietsma,* 537 U.S. at 59, 123 S.Ct. 518 (quoting the saving clause contained in the Federal Boating Safety Act: "Compliance with this chapter or standards, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law"); *Geier,* 529 U.S. at 868, 120 S.Ct. 1913 (quoting the saving clause contained in the National Traffic and Motor Vehicle Safety Act: " '[c]ompliance with' a federal safety standard 'does not exempt any person from any liability under common law' "); *Myrick,* 514 U.S. at 285, 115 S.Ct. 1483 (quoting the saving clause contained in

ful to warn that its intention was to leave common law duties and liabilities absolutely unchanged; not only would the OSH Act neither "enlarge [n]or diminish" the common law, but—just in case there was some other way to modify tort law besides "enlarging or diminishing" it—Congress further stipulated that the OSH Act would not "affect [the common law] in any other manner." It is difficult to imagine a more explicit statement of Congressional intention to preserve and not pre-empt state common law.[22] Moreover, it was particularly the common law related to "injuries, diseases, or death"—as opposed to, say, damage to reputation—that Congress carefully preserved. With the saving clause, Congress plainly "disclaimed any interest in promoting [workplace safety] by means that fail to provide adequate remedies for those who are injured by exposure to hazardous [chemical] materi-

als." *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 257, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (holding that the Atomic Energy Act did not pre-empt punitive damage awards stemming from exposure to hazardous nuclear materials).[23]

Given Congress's explicit and broad saving clause, this Court need not merely "*assum[e]* that the historical police powers of the States were not ... superseded by the OSH Act," *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240 (emphasis added); rather, the Court need simply follow Congress's clear directive that it did *not* mean for the OSH Act to supersede non-conflicting state law. While Congress's directive does not preclude application of the doctrine of implied pre-emption, *Sprietsma*, 537 U.S. at 65, 123 S.Ct. 518, the scope of any implied pre-emption must remain as narrow as reasonably possible. *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240. Narrow appli-

---

the National Traffic and Motor Vehicle Safety Act: "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law"); *but cf. AT & T Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (finding that a tort claim, which was "wholly derivative" of a contract claim, was pre-empted because it was "absolutely inconsistent" with the Communications Act, even though the Act included the following saving clause: "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies").

22. The limited legislative history also supports this view. *See* S. Rep. 91–1282 (1970), 1970 WL 5923, U.S.Code Cong. & Admin. News 1970, 5177, 5185–86 (noting that, because the federal standards could not possibly be all-encompassing, Congress incorporated the "principles of common law" when it included a provision in the OSH Act obligating employers to the general duty not to harm others, and that this provision "merely restates that each employer shall furnish this degree of care" toward its employees).

23. The breadth of the saving clause in the OSH Act, and relative ambiguity of the pre-emption provision, makes clearly distinguishable many of the cases cited by defendants addressing the pre-emptive effect of *other* Congressional statutes with clear pre-emption provisions. *See, e.g., MacDonald v. Monsanto Co.*, 27 F.3d 1021 (5th Cir.1994) (finding that the pre-emption provision in the Federal Insecticide, Fungicide and Rodenticide Act—which mandates that no State shall "impose or continue in effect any requirements for labeling or packaging in addition to or different from those required" by the Act—pre-empts common law claims for failure to properly label herbicides); *Moss v. Parks Corp.*, 985 F.2d 736 (4th Cir.1993), *cert. denied*, 509 U.S. 906, 113 S.Ct. 2999, 125 L.Ed.2d 693 (1993) finding that the pre-emption provision in the Federal Hazardous Substances Labeling Act—which provides that "no State ... may establish or continue in effect a cautionary labeling requirement ... unless such cautionary labeling requirement is identical to the labeling requirement" of the Act—pre-empts some (but not all) common law claims for failure to warn).

cation means that this Court will not "hunt for a conflict" between state and federal law.

In sum, the very broad saving clause of the OSH Act makes it clear that: (1) Congress did not expressly pre-empt state tort law claims; and (2) if Congress meant to imply pre-emption of any tort claims, it meant to do so only in the narrowest of circumstances—that is, only when there is a conflict between state tort law and federal regulation that is especially "direct, clear and substantial." *Gade*, 505 U.S. at 107, 112 S.Ct. 2374.[24]

### 3. In *Gade*, There Was Clearly a "Standard in Effect."

The OSH Act repeatedly refers to the pre-emptive effect of a federal *standard*. For example, the OSH Act provides that "[n]othing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which *no [federal] standard is in effect* under section 655 of [the OSH Act]." 29 U.S.C. § 667(a) (emphasis added). The *Gade* Court held that this clause "presupposes a background pre-emption of all state occupational safety and health *standards* whenever *a federal standard* governing the same issue is in effect." *Gade*, 505 U.S. at 100, 112 S.Ct. 2374 (emphasis added). The OSH Act also provides that, if a State "desires to assume responsibility for development and enforcement therein of occupational safety and health *stan-*

*dards* relating to any occupational safety or health issue with respect to which a Federal *standard* has been promulgated under [the OSH Act, the State] shall submit a State plan for the development of such *standards* and their enforcement." 29 U.S.C. § 667(b). And the Act defines an "occupational safety and health standard" as one which "requires conditions, or the adoption or use of one or more practices,. means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8).

In *Gade*, there was clearly a "federal standard in effect" (29 C.F.R. § 1910.120(e), which required certain amounts of training and experience for hazardous waste workers) and also a state "standard in effect" (Ill.Rev.Stat. ¶¶ 7705 *et seq.*, which required different and mostly higher amounts of training and experience for hazardous waste workers); the Court concluded the latter was pre-empted because it created actual conflict with the former. There was no question but that the positive enactments of Illinois and OSHA qualified as "occupational safety and health standards." That is because, in each instance where the term "standard" appears in the OSH Act, the "focus is [workplace-]specific enactments of positive law by legislative or administrative bodies, not the application of general rules of common law by judges and juries." *Medtronic*, 518 U.S. at 489, 116 S.Ct. 2240.[25] It makes no sense, for example, to read

---

**24.** Adding even more weight to this conclusion is Congress's instruction that the OSH Act would not "affect in any manner" any state *workmen's compensation* law. The statutory, private rights and remedies between employer and employee that comprise workmen's compensation law are *more* directly connected to the workplace than are private rights and remedies that are a part of tort law. In light of the clear Congressional intent to save workmen's compensation laws, which directly regulate the workplace, it

would make little sense to ascribe to Congress an intent to pre-empt a tort claim for failure to warn, which works far more indirectly to regulate the workplace—especially when the tort claim is brought against a third party, and not the plaintiff's employer. *See Pedraza*, 942 F.2d at 53 n. 6.

**25.** In *Cipollone* the Supreme Court found pre-emption based on its interpretation of the word "requirements," concluding that the phrase "no requirement ... shall be imposed under State law" reached to pre-empt certain

§ 667(b) of the OSH Act as requiring a State to submit to the Secretary of Labor for his approval its pre-existing common law duty to warn, because it falls under the rubric of being a safety and health standard.

The laws that the MDL defendants argue are pre-empted are not positive enactments of a legislature or regulatory body, not part of a "State plan" detailing workplace safety standards and mechanisms for their enforcement. Rather, they are the States' common laws, imposing on the general public duties to warn others of possible harm. Using the *Gade* analysis, the circumstances in this case do not support pre-emption.

This still leaves the question, however, of whether the circumstances presented here support pre-emption under a different analysis.

### B. The HazCom Standard.

Although the distinction between tort law and positive regulation takes this case outside of *Gade's* pre-emptive ambit, a federal regulation is implicated in this case that was not relevant in *Gade:* the HazCom Standard. As noted, the HazCom Standard requires all employers to distribute MSDSs to their employees, and ensure that products in the workplace are labeled with: (1) the identity of any hazardous chemicals; and (2) appropriate hazard warnings. There is no question but that these federal standards allude to the common law duty to warn. Further, the HazCom Standard purports to set out its own pre-emptive scope: the regulation "is intended to address comprehensively the is-

sue of evaluating the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures to employees, and to preempt any legal requirements of a state, or political subdivision of a state, pertaining to this subject." 29 C.F.R. § 1910.1200(a)(2). Thus, there is also no question but that OSHA intends the HazCom Standard to pre-empt state law "pertaining to" the subject.

■ There are three reasons, however, why the Court concludes that the HazCom Standard does not pre-empt the plaintiffs' common law claims in this MDL lawsuit, either expressly or by implication. First, the pre-emptive reach of the HazCom Standard cannot exceed the pre-emptive reach of the OSH Act itself. Second, it is questionable whether the "subject matter" of the HazCom Standard does, in fact, address the same duty to warn invoked by the plaintiffs. And third, it appears to the Court that there is no actual conflict between the HazCom Standard and the plaintiffs' claims. The Court explains each of these reasons below.

### 1. HazCom Standard Pre-emption Cannot Exceed OSH Act Pre-emption.

■ As noted above, Congress included in the OSH Act an extremely broad saving clause, expressly stating its intent that the OSH Act not pre-empt state tort law claims except, by implication, when there exists a conflict between state tort law and federal regulation that is especially "direct, clear and substantial." *Gade,* 505 U.S. at 107, 112 S.Ct. 2374. Against

tort law duties. *Cipollone,* 505 U.S. at 515, 112 S.Ct. 2608. But the *Medtronic* Court later *rejected* the argument that, "by using the term 'requirement' [in the Medical Devices Act], Congress clearly signaled an intent to deprive States of any role in protecting consumers from the dangers inherent in many medical devices." *Medtronic,* 518 U.S. at

489, 116 S.Ct. 2240. The Court found that, like the term "standard" in the OSH Act, the term "requirement" in the Medical Devices Act consistently referred to positive enactments of statutory and regulatory law. *Id.* See also *Geier,* 529 U.S. at 867–68, 120 S.Ct. 1913 (discussing the terms "requirement" and "standard").

this background, OSHA's HazCom Standard purports to pre-empt "any legal requirements" pertaining to the subject of "evaluating the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures to employees." To the extent that these directives clash, the Supreme Court counsels that "a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority." *Louisiana Public Service Commission v. F.C.C.*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); *see also New York v. Federal Energy Regulatory Comm'n*, 535 U.S. 1, 18, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002). Stated differently, "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *F.C.C.*, 476 U.S. at 374, 106 S.Ct. 1890.[26]

In the OSH Act, Congress authorized the Secretary of Labor to "promulgate as an occupational safety or health standard any national consensus standard, and any established Federal standard, unless he determines that the promulgation of such a standard would not result in improved safety or health for specifically designated employees. In the event of conflict among any such standards, the Secretary shall promulgate the standard which assures the greatest protection of the safety or health of the affected employees." 29 U.S.C. § 655(a). While this provision gives the

Secretary wide latitude to promulgate health standards, Congress circumscribed the Secretary's jurisdiction to this degree: first, he can only promulgate a standard that is already "established" by federal law or is a standard of "national consensus;" and second, when there is more than one choice, the Secretary must promulgate the health standard that provides the greatest degree of protection. Congress's grant of authority to the Secretary does not address the question of tort law, suggesting again that the term "standard" refers to positive guidelines, regulations, or enactments.

A comparison of the OSH Act's saving clause and its grant of authority to the Secretary of Labor shows that the saving clause language is "certainly as sweeping as the wording of the provision declaring the purpose of the Act and the role of [OSHA]." *F.C.C.*, 476 U.S. at 370, 106 S.Ct. 1890. At the same time, the saving clause is more specific than the grant of authority to the Secretary with regard to how federal standards may affect state common law: the saving clause makes clear Congress's intent to pre-empt state tort law to the narrowest degree possible, while the grant of authority mandates promulgation of "consensus" standards. *See Sprietsma*, 537 U.S. at 63, 123 S.Ct. 518 (noting the "contrast between [the saving clause's] general reference to 'liability at common law' and the more specific and detailed description of what is pre-empted," and holding the former trumps the latter); *cf.*

---

**26.** The Supreme Court continued: "we simply cannot accept an argument that [a federal agency] may nevertheless take action which it thinks will best effectuate a federal policy. An agency may not confer power upon itself. To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress. This we are both unwilling and unable to do." *F.C.C.*, 476 U.S. at 374–75, 106 S.Ct. 1890. *See also*

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (noting that, when examining an agency's interpretation of a Congressional enactment, a reviewing court must first ask "whether Congress has directly spoken to the precise question at issue;" if Congress has done so, the inquiry is at an end, as the court "must give effect to the unambiguously expressed intent of Congress").

*id.* ("we would be disinclined to favor the provision declaring a general statutory purpose, as opposed to the provision which defines the jurisdictional reach of the agency formed to implement that purpose"); *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 385, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (comparing a "general" saving clause with a "specific substantive pre-emption provision" and noting: "it is a commonplace of statutory construction that the specific governs the general").[27] Accordingly, the Secretary's standards must be construed to pre-empt state law only when there is a clear, unavoidable conflict. OSHA cannot pre-empt state tort law—neither expressly nor by implication—any more than the Congressional Act that enables OSHA in the first place.[28]

In sum, despite OSHA's statement of *express* pre-emption in the HazCom Standard, this Court must construe the regulation consistent with Congress's stated pre-emptive intent—which is to imply pre-emption of state tort law only when it directly, clearly, and substantially conflicts with federal law.

## 2. The HazCom Standard's "Subject Matter."

There is another angle from which to view the HazCom Standard's express pre-emption provision, one which does not cause any clash with the OSH Act's saving clause. The HazCom Standard states an intention to pre-empt "any legal requirements of a state, or political subdivision of a state, pertaining to *this subject." Id.* § 1910.1200(a)(2) (emphasis added). The subject referred to is "evaluating the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures *to employees." Id.* (emphasis added); *see id.* § 1910.1200(a)(1) ("The purpose of this section is to ensure that the hazards of all chemicals produced or imported are evaluated, and that information concerning their hazards is transmitted to *employers and employees* ") (emphasis added). This is consonant with Congress's stated goals behind the OSH Act: in order to achieve "healthful working conditions," 29 U.S.C. § 651(b), the Act imposes duties on "employers and employees," *id.* §§ 651(b)(1–2) & 654, which apply "to employment performed in a workplace," *id.* § 653(a). The entire thrust of the OSH Act and its related regulations is to clarify and regularize the duty of *employers* to protect their *employees* in the *workplace.*[29]

This is not the same "subject matter," however, as the common law duty to warn invoked by the plaintiffs. The great bulk of the plaintiffs' claims are not directed at their employers, for whom they labored at

**27.** *See also Martin v. S.C. Johnson & Sons, Inc.,* 1996 WL 165039 at *4 (D.Virgin Islands Mar.21, 1996), *affirmed without op.,* 107 F.3d 7 (3rd Cir.1997) ("It may well be inappropriate to apply the specific [pre-emption] provision [in the HazCom Standard] to supersede the general provision where the saving clause has always been an integral part of the OSH Act. Moreover the specific preemption provision at issue is found in an OSHA standard, not in the statute itself. OSHA is not empowered to promulgate any regulations that are broader in scope than the statute.");

**28.** *See also Medtronic,* 518 U.S. at 489 n. 9, 116 S.Ct. 2240 (noting that, while the Supreme Court found certain common law torts

pre-empted in *Cipollone,* the "pre-emptive effect of the statute in *Cipollone* was not dependent on the issuance of any agency regulations").

**29.** *See also* 48 Fed.Reg. 53281 (1983), 1983 WL 134259 (when OSHA formally promulgated the HazCom Standard, it noted: "[t]he purpose of this standard is to establish uniform requirements for hazard communication *in one segment of industry, the manufacturing division* "); *see also id.* at 53,323–24 (quoting testimony asserting that, while the "tort liability system" is insufficient to compel employers to provide information to employees regarding hazards of chemical substances, it will continue in force).

welding; rather, the claims are directed at the *manufacturers* and *suppliers* of the welding rod products that their employers then supplied to them. These manufacturers and suppliers have an independent duty to warn the plaintiffs about the hazards associated with welding rod fumes; while this duty may be related to the duties of the plaintiffs' employers, it is a separate and different duty and does not arise out of the employer/employee relationship. *See Minichello v. U.S. Industries, Inc.,* 756 F.2d 26, 29 (6th Cir.1985) ("[e]ven ... if the OSHA regulations were intended to affect civil liability—as Congress has made clear they are not—they would not bear upon the relationship between the parties in this case" because "OSHA regulations ... do not even apply to the relationship between ... producer and consumer") (citations omitted); *cf. Ohio Mfrs. Ass'n v. City of Akron,* 801 F.2d 824, 825 (6th Cir.1986) (concluding the HazCom Standard pre-empted a city ordinance that "regulat[ed] hazardous and toxic substances in the workplace" by, inter alia, "requiring employers to provide information to their employees").

The defendants in this case assert that, despite this distinction between their role as manufacturer or supplier and the role of a plaintiff's own employer, the HazCom Standard still pre-empts the plaintiffs' claims by its express language. This Court cannot agree. Even if the HazCom Standard does, as it expressly states, "preempt any legal requirements of a state, or political subdivision of a state, pertaining to *this subject*" (emphasis added), it is highly questionable whether the "requirements" imposed by the common law duty to warn "pertain" to the same subject addressed by the Standard.

The Supreme Court was careful to note this distinction itself in *Medtronic*. The MDL defendants explain that the HazCom Standard pre-empts state law "requirements," which is the same term the Supreme Court examined in *Cipollone* and found pre-emptive. But the Supreme Court subsequently explained that Congress's use of the term "requirement," by itself, did not signal an "intent to deprive States of any role in protecting consumers from the dangers inherent in" the product. *Medtronic,* 518 U.S. at 489, 116 S.Ct. 2240 (examining the term "requirement" and finding no pre-emption). "The pre-emptive statute in *Cipollone* was targeted at a limited set of state requirements ..., and then only at a limited subset of the possible application of those requirements." *Medtronic,* 518 U.S. at 488, 116 S.Ct. 2240. Further, even after application of the pre-emption doctrine, the *Cipollone* plaintiff was still left with several varieties of tort law claims. *Id.* But under the MDL defendants' interpretation of the HazCom Standard in this case, "because there is no explicit private cause of action against manufacturers contained in the [OSH Act] and no suggestion that the Act created an implied private right of action, Congress would have barred most, if not all, relief for persons injured by [welding rods]." *Id.* at 487, 116 S.Ct. 2240 (footnote omitted). "It is, to say the least, 'difficult to believe that Congress would, without comment, [authorize a federal agency to] remove all means of judicial recourse for those injured by illegal conduct,'" especially in light of Congress's OSH Act saving clause. *Id.* (quoting *Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)).[30]

---

**30.** *See also Pedraza,* 942 F.2d at 54 n. 7 (quoting *Silkwood* and rejecting the argument that the HazCom Standard pre-empts common law claims premised on a duty to warn). Defendants assert that, if the Court were to grant their pre-emption motion, plaintiffs could still pursue design defect claims. Defendants concede, however, that the gravamen of plaintiffs' complaints is not that the

Furthermore, it bears repeating that the term "requirement," as used in the Haz-Com Standard, is most often "linked with language suggesting that its focus is ... enactments of positive law by legislative or administrative bodies, not the application of general rules of common law by judges and juries." *Medtronic*, 518 U.S. at 489, 116 S.Ct. 2240. The "subject matter" of the HazCom Standard, then, pertains to positive regulations governing employers and employees in the workplace; the subject matter does not reach broadly to include common law duties to warn owed by manufacturers and suppliers to end users of their products. Like the defendants in *Medtronic*, the MDL defendants in this case offer a "sweeping interpretation of the [HazCom Standard] [which] would require far greater interference with state legal remedies [than in *Cipollone*], producing a serious intrusion with state legal sovereignty while simultaneously wiping out the possibility of remedy for the [plaintiffs'] alleged injuries." *Id.* at 488, 116 S.Ct. 2240 (footnote omitted). This interpretation is at odds with Supreme Court instruction to read pre-emptive language in federal regulations narrowly.[31]

Seen in this light, the HazCom Standard can be read to create little friction with the OSH Act's saving clause. *See Geier*, 529 U.S. at 869, 120 S.Ct. 1913 ("a reading of the express pre-emption provision that excludes common-law tort actions gives actual meaning to the saving clause's literal language"). Express pre-emption by the HazCom Standard of *positive regulations governing employers and employees in the workplace* yields the narrowest implied pre-emption of common law duties to warn owed by manufacturers and suppliers to end-use consumers of their products. Only if the requirements imposed by the common law duty create actual conflict with HazCom Standard provisions so construed will the common law be pre-empted.

### 3. Absence of Conflict.

Finally, and perhaps most importantly, the Court concludes that there is no substantial, clear, or direct conflict between the HazCom Standard and the common law duty to warn invoked by plaintiffs. That is, the Court concludes as follows: (1) even if the express pre-emptive reach of the HazCom Standard does not exceed Congress's intent, and (2) even if the common law duty to warn invoked by the plaintiffs "pertain[s] to the subject" of "evaluating the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures to employees," (3) it remains true that, ultimately, the duty invoked by

---

welding rods were defective, but that the plaintiffs were not sufficiently warned of the hazards of using these otherwise-effective products. Indeed, the parties seem to agree that, given current technology, welding rods: (1) could not be designed without manganese and still maintain their necessary and desirable properties, and (2) could not be used for their intended purpose without releasing some measure of manganese-containing fumes.

31. As the *Medtronic* court explained, in the context of examining the pre-emptive effect of the Medical Devices Act ("MDA"): "the predicate for the [plaintiff's] failure to warn claim is the general duty to inform users and pur-chasers of potentially dangerous items of the risks involved in their use. These general obligations are no more a threat to federal requirements than would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a work force. These state requirements therefore escape pre-emption, not because the source of the duty is a judge-made common-law rule, but rather because their generality leaves them outside the category of requirements that [the MDA's pre-emption provision] envisioned to be 'with respect to' specific devices such as pacemakers." *Medtronic*, 518 U.S. at 501–02, 116 S.Ct. 2240.

the plaintiffs *does not actually conflict* with the HazCom Standard. The defendants can comply with both the HazCom Standard and their alleged state law duty to warn plaintiffs; one does not interfere with the other.

That this is true is seen by examining carefully just what the HazCom Standard requires in the way of product hazard warnings. Section 1910.1200(f) of the HazCom Standard addresses the "Labels and other forms of warning" that must accompany hazardous materials. Subsection(f)(1) sets out the requirements for the "chemical manufacturer, importer, or distributor," while subsection (f)(5) sets out the requirements of the "employer":

> (1) The chemical manufacturer, importer, or distributor shall ensure that each container of hazardous chemicals leaving the workplace is labeled, tagged or marked with the following information:
>
> > (i) Identity of the hazardous chemical(s);
> >
> > (ii) *Appropriate hazard warnings;* and
> >
> > (iii) Name and address of the chemical manufacturer, importer, or other responsible party.
>
> \* \* \*
>
> (5) \* \* \* the employer shall ensure that each container of hazardous chemicals in the workplace is labeled, tagged or marked with the following information:
>
> > (i) Identity of the hazardous chemical(s) contained therein; and,
> >
> > (ii) *Appropriate hazard warnings,* or alternatively, words, pictures,

symbols, or combination thereof, which provide at least general information regarding the hazards of the chemicals, and which, in conjunction with the other information immediately available to employees under the hazard communication program, will provide employees with the *specific information* regarding the physical and health hazards of the hazardous chemical.

(Emphasis added). Both manufacturers and employers are also required to obtain Material Safety Data Sheets (MSDSs), listing hazardous chemicals and their toxic properties. *Id.* § 1910.1200(g).

As noted earlier, the HazCom Standard is completely silent regarding any duties a manufacturer or supplier has to non-employee, end-use consumers. Even assuming, however, that the defendants in this case owe the plaintiffs *only* the same duties that the manufacturers and employers owe to downstream employers and employees under the HazCom Standard (and owe the plaintiffs *no* additional duties), the duty owed is to "ensure that each container of hazardous chemicals … is labeled, tagged or marked with … *[a]ppropriate hazard warnings.*" *Id.* § 1910.1200(g) (emphasis added).[32] Nowhere does the HazCom Standard define what makes a hazard warning sufficient or "appropriate," except that it must "convey the specific physical and health hazards" of the chemicals. *Id.; see id.* 1910.1200(f)(5)(iii) (warnings must provide "specific information regarding the physical and health hazards of the hazardous chemical"). Ultimately,

---

**32.** The HazCom Standard defines "hazard warning" to mean "any words, pictures, symbols, or combination thereof appearing on a label or other appropriate form of warning which convey the specific physical and health hazard(s), including target organ effects, of the chemical(s) in the container(s)." *Id.*

§ 1910.1200(c). Section 1910.1200(c) goes on to define "health hazard" and "physical hazard." Appendices A & B to the HazCom Standard provide more detailed definitions of health hazards and set out criteria to determine whether a chemical is hazardous.

then, the HazCom Standard does not prescribe in any way the language a chemical manufacturer or other employer must use to warn about health hazards.[33] The manufacturer or employer can choose to give whatever warning it deems appropriate. *Cf. Worm v. American Cyanamid Co.*, 970 F.2d 1301, 1307 (4th Cir.1992) ("If federal law *mandates a specific label and permits nothing additional or different*, it can hardly be urged that a state tort duty based on a warning requirement that is more elaborate and different does not conflict.") (emphasis added).

Indeed, the warnings set out by the manufacturers in this case on their MSDSs, apparently in order to conform to the HazCom Standard, vary substantially, setting out significantly different amounts of information and admonition. For example, United States Welding Corporation and Hobart Brothers have each issued a MSDS for certain varieties of their respective welding rod products; both of these MSDSs contain a "Section VI" titled "Health Hazard Data." Under this heading, the two manufacturers each include warnings regarding welding fumes and manganese, as shown below.[34]

| Manufacturer | MSDS Section VI—Health Hazard Data |
| --- | --- |
| Hobart Brothers | **SHORT–TERM (ACUTE) OVEREXPOSURE EFFECTS:** WELDING FUMES—May result in discomfort such as dizziness, nausea, or dryness or irritation of nose, throat, and eyes. <br> \* \* \* <br> **LONG–TERM (CHRONIC) OVEREXPOSURE EFFECTS:** |

**33.** A related regulation promulgated by OSHA, 29 C.F.R. § 1910.252, addresses itself to "welding, cutting, and brazing." Subpart (c)(1)(iv) of this regulation states:

*(iv) Precautionary labels.* A number of potentially hazardous materials are employed in fluxes, coatings, coverings, and filler metals used in welding and cutting or are released to the atmosphere during welding and cutting. These include but are not limited to the materials itemized in paragraphs (c)(5) through (c)(12) of this section [addressing flourine, zinc, lead, beryllium, cadmium, mercury, cleaning compounds, and stainless steel]. The suppliers of welding materials shall determine the hazard, if any, associated with the use of their materials in welding, cutting, etc.

(A) All filler metals and fusible granular materials shall carry the following notice, *as a minimum*, on tags, boxes, or other containers:

CAUTION

Welding may produce fumes and gases hazardous to health. Avoid breathing these fumes and gases. Use adequate ventilation. See ANSI Z49.1–1967 Safety in Welding and Cutting published by the American Welding Society.

(Emphasis added).

The fact that this notice is a "minimum" warning suggests, again, that the common law duty to warn does not conflict with this regulation. *See Geier*, 529 U.S. at 868, 120 S.Ct. 1913 ("a reading of the express preemption provision that excludes common-law tort actions gives actual meaning to the saving clause's literal language, while leaving adequate room for state tort law to operate— for example, where federal law creates only a floor, i.e., a minimum safety standard"). While 29 C.F.R. § 1910.252(c)(1)(iv)(A) sets out what a warning must include at a minimum, it does not proscribe additional warnings in compliance with common law duties. Indeed, the above-quoted warning was adopted *voluntarily* by members of the the American Welding Society in 1966, well before the HazCom was promulgated; thus, § 1910.252(c)(1)(iv)(A) simply sets out a minimum "national consensus standard."

**34.** *See* www.hobartbrothe rs.com/msds.asp (doc no. 415884); www.usweldingco rp. com/msds/msd shigh.htm. It is unclear if these warnings are also on the packaging of the welding rods.

| | |
|---|---|
| | WELDING FUME—Excess levels may cause bronchial asthma, lung fibrosis, pneumoconiosis or "siderosis". * * * MANGANESE—Long-term overexposure to manganese compounds may affect the central nervous system. Symptoms may be similar to Parkinson's disease and can inculde [sic] slowness, changes in handwritting [sic], gait impariment [sic], muscle spasms and cramps and less commonly, tremor and behavioral changes. Employees who are overexposed to manganese compounds should be seen by a physician for early detection of neurological problems. |
| United States Welding Corp. | * * * [W]hen welding or using any other process that causes a release of dust or fume, hazardous levels of dust or fume of the constituents of these alloys could be generated. * * * The following is a list of potential health effects and exposure limits for hazardous elements that are possibly contained in any of our alloys. **Manganese (Mn):** * * * Acute effects include skin and eye irritation and metal fume fever. Chronic exposure may lead to central nervous system effects: headache, changes in motor activity and psychological disturbances. |

That these warnings are so different makes clear that the HazCom Standard does not compel the use of any given wording; the federal regulation leaves manufacturers and employers to determine for themselves whether they have complied with the regulation's instruction to give "appropriate" hazard warnings. Further, these warnings may, in fact, fulfill completely the defendants' common law duty to warn. But plaintiffs remain entitled to pursue claims to the contrary.

In effect, the HazCom Standard is silent regarding what warning the defendants must provide, in their role as manufacturer or employer, to employees who use their product; the HazCom Standard only requires that the defendants provide *some* warning, which must be "adequate." This requirement simply does not conflict with any general state law duty; if anything, OSHA's requirement of an "adequate warning" is entirely contiguous with the general duty imposed by the common law to warn others of known hazards. *See Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 446, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960) ("the teaching of this Court's decisions ... enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists").

Where, as here, Congress has stated explicitly and clearly its intent not to preempt common law damage claims, and where, as here, pursuit of these claims does not actually conflict with the federal regulatory scheme, this Court concludes that the plaintiffs' state law claims for failure to warn are neither expressly nor impliedly pre-empted. The plaintiffs' claims based on a failure to warn, whether pursued under a theory of strict liability, negligence, fraud, or conspiracy, are not pre-empted by the OSH Act or the HazCom Standard.

## IV. Conclusion.

The Supreme Court, in *Cipollone,* concluded that Congress's pre-emption of state law "requirements" worked to pre-empt not only positive enactments, but also certain common law torts. The mov-

ing defendants seek to apply the same reasoning in this case, noting that the Haz-Com Standard also states an intent "to preempt any legal requirements" pertaining to the subject of "evaluating the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures to employees." 29 C.F.R. § 1910.1200(a)(2). The defendants present a sophisticated argument and, relying on the somewhat conflicting Supreme Court case law, muster more than insubstantial support for their position.[35]

Of course, "there is no indication that Congress in [1970 or OSHA in 1985] knew that 'requirements' would later be read to encompass common-law doctrine. The examples in the [1970] legislative history of varying state requirements intended to be preempted involved legislative and administrative regulation ..., not common-law tort actions." *Wilson v. Bradlees of New England, Inc.,* 96 F.3d 552, 556 (1st Cir. 1996), *cert. denied sub nom Union Underwear Co., Inc. v. Wilson,* 519 U.S. 1149, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997) (concluding, post-*Cipollone,* that Congress's 1976 Flammable Fabrics Act did not pre-empt a common law failure to warn claim). For this reason, among others, courts presented with pre-emption arguments frequently find there is "no inescapably 'right' answer." *Id.* This Court has struggled with the task of divining the intent of Congress as expressed by its own statements and also the statements of the federal agency to which it delegated authority.

In the end, this Court's reading of all the recent Supreme Court cases involving federal pre-emption leaves it with the conclusion that *Cipollone* cannot be read as broadly as defendants would like. In the OSH Act, Congress used pointed language to expressly save common law claims. As such, OSHA cannot expressly pre-empt common law claims for failure to warn. This leaves the possibility of implied pre-emption. But even in those cases where the Supreme Court found that state tort law was impliedly pre-empted, the Court applied the doctrine as narrowly as reasonably possible, finding pre-emption of common law only where the conflict between federal and state requirements was clear. A careful parsing of the federal requirements in this case leaves the Court convinced that no clear Supremacy Clause conflict arises. The HazCom Standard directs the defendants to give their employees appropriate warnings. State common law duties requiring manufacturers and suppliers to warn the general public of known hazards does not pose an obstacle to compliance with this federal directive. For all of the reasons stated above, the Court denies the defendants' motion to dismiss based on federal pre-emption.[36]

**IT IS SO ORDERED.**

35. In particular, the Court notes that the arguments on this point presented by counsel for Deloro Stellite, both on brief and at the October 28, 2004 hearing on this matter, were especially cogent.

36. Of course, this ruling has no bearing on the questions of: (1) whether the plaintiffs have stated claims upon which relief can be granted; or (2) whether the plaintiffs will succeed on any of their claims on the merits. The Court knows the defendants have raised and will raise these separate questions in other motions and at trial.